**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLIFFY CARE LANDSCAPING LLC<br>15837 S. Mahaffie Street<br>Olathe, KS 66062<br><br>on behalf of itself and all others similarly<br>situated,<br>　　　　　　*Plaintiff*,<br><br>v.<br><br>FACEBOOK, INC.<br>1601 Willow Road<br>Menlo Park, CA 94025<br><br>GOOGLE LLC<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043,<br><br>and<br><br>ALPHABET INC.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043<br><br><br>　　　　　　*Defendants*. | Case No._____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, individually and on behalf of a Class of all those similarly situated, brings this class action complaint for equitable relief and treble damages against Defendants, FACEBOOK, INC. ("Facebook"), GOOGLE LLC, and ALPHABET INC. (collectively, "Google") for violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and alleges as follows:

## I.      NATURE OF THIS ACTION

1.      In 2019, spending in the United States on digital, online advertising reached $129.34 billion, exceeding for the first time the total spent in the U.S. on all forms of traditional print, radio, television and billboard advertising. In 2021, digital ad spending in the U.S. is expected to reach $198 billion, about a third of which, or $66.2 billion, will be spent on search advertising, in which advertisers target search engine users searching for a particular product or service and pay to have ads placed next to the search results. This audience is composed mostly of users of Google, which has an 88% share of search queries in the U.S. and a 92% share of search queries worldwide. The remaining U.S. digital ad spend, or about $132 billion, will be spent on display advertising, in which advertisers place images, banners, or videos on websites likely to be viewed by the advertiser's target audience.

2.      About 86% of today's online display advertising will be bought and sold electronically at high speeds through centralized trading venues known as "exchanges." Beginning in 2005, the rise of electronic ad trading, known as "programmatic advertising," has transformed advertising from a relationship business to a commodity business, with publishers[1] and advertisers transacting with each other in an electronic spot market. Google's advertising exchange alone trades ad spaces targeted to billions of individual users and processes tens of billions of targeted ads daily.

3.      With enormous audiences, a huge inventory of content, and the advantages of network effects and technological prowess, Google, Facebook, and Amazon control about 79% of non-search digital advertising. Facebook's 2.8 billion monthly users and Google's 1.8 billion

---

[1] A publisher is the operator of a website or mobile app that makes space available for the display of advertisements, including images, banners, and videos.

Gmail account holders—together with their identities, search and browsing histories, spending habits, social connections, and locations—endow these firms with unprecedented capacity to reach and target consumers. In addition to selling display space on their "owned-and-operated" properties, Google, Facebook, and to a lesser extent, Amazon, also sell advertisers space on third party websites, acting as intermediaries in what has become known as the "open display" advertising market.

4.      A large proportion of open display advertising is sold directly to advertisers through the "ad networks" operated by each of these firms: the Google Display Network ("GDN") (part of Google Ads), the Facebook Audience Network ("FAN"), and the Amazon Demand Side Platform ("Amazon DSP"). Defendants' ad networks, GDN and FAN, accounts for about 67% of the total open display ad spend, while Amazon's share and those of other networks are far lower.

5.      Defendants' horizontally competing ad networks, GDN and FAN, should vigorously compete for advertisers and publishers, but they do not. Instead, as alleged in a Complaint filed against Google on December 16, 2020 by 10 state attorneys general[2] and elaborated upon in an article in the *New York Times* on January 17, 2021,[3] Defendants conspired to allocate to one another the advertisers and publishers affiliated with each network and to eliminate competition between them in the open display advertising market. In an agreement that Google insiders codenamed "Jedi Blue," Facebook agreed to bid FAN's demand through Google's ad exchange, rather than directly through multiple exchanges using a competing technology called "header bidding." In return for that agreement, FAN received (i) preferential

---

[2] Texas *et al.* v. Google LLC, *Complaint* (E.D.Tx. 4:20-cv-00957, filed Dec. 12, 2020).
[3] Daisuke Wakabayashi and Tiffany Hsu, "Behind a Secret Deal Between Google and Facebook," *New York Times*, Jan. 17, 2021, available at https://nyti.ms/3imRzwt.

treatment over other bidders, including a guaranteed "win rate,"; (ii) superior information about the advertising opportunity, including the identity of the user most of the time; and (iii) increased "timeouts" for Facebook to bid before it was excluded from the auction, all of which allowed Facebook to bid and win more often relative to non-Facebook bidders.

6.     Defendants' conspiracy to collude rather than compete violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and has caused and will continue to cause injury and economic harm to Plaintiff and all other similarly situated advertisers that bid through Google's Open Bidding program through any non-FAN ad network or demand-side platform, including Google Ads and GDN, for which Plaintiff seeks appropriate equitable relief and damages through this action.

## II.     JURISDICTION AND VENUE

7.     This Court has original jurisdiction over Plaintiff's federal antitrust claims, which arise under Sections 1 and 15 of the Sherman Act, 15 U.S.C. §§ 1, 15, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000. This Court also has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 & 1337.

8.     This Court has personal jurisdiction over Defendants, which are found and transact business in this district.

9.     The Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period (defined below), Defendants resided, transacted business, and had agents in this district.

10.     Defendants' acts were within the flow of, were intended to have, and did have a substantial effect on the interstate commerce of the United States.

## III.    PARTIES

A.     Plaintiff

11.     Plaintiff Cliffy Care Landscaping is a limited liability company in good standing, registered in the state of Kansas, with a principal place of business at 15837 S. Mahaffie Street, Olathe, Kansas, 66062.  Plaintiff purchased display advertising through Google Ads between September 2018 and the present.

B.     Defendants

12.     Defendant Facebook, Inc., is a publicly traded, for-profit company, organized under the laws of Delaware with its principal place of business at 1601 Willow Road, Menlo Park, California. Facebook's principal business provides personal social network services to approximately 3 billion people throughout the world through control of its network, known internally as "Facebook Blue."

13.     Defendant Google LLC, is a limited liability company organized under the laws of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California. Google LLC is a wholly owned and controlled subsidiary of XXVI Holding Inc., which is a subsidiary of Defendant Alphabet Inc.

14.     Defendant Alphabet Inc., is a publicly traded, for-profit company organized under the laws of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California. Google LLC is a wholly owned subsidiary of Alphabet.

15.     Defendants Google LLC and Alphabet Inc., are collectively referred to herein as "Google." Google is a technology company that provides internet-related services and products,

including online advertising technologies, the world's most dominant search engine, and the world's most visited website, YouTube.

16.     Defendants' conduct was authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendants' affairs.

17.     Defendants, through their subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the alter ego, agent or joint-venturer of or for the other with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

## IV.    CLASS ALLEGATIONS

18.     Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All persons who purchased digital display advertising through Google Ads, Amazon DSP, or other non-Facebook demand-side platform to reach consumers in the United States between September 2018 and the present ("Class Period").

Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

19.     <u>Class Identity/Ascertainability</u>: The Class is readily identifiable and is one for which records should exist.

20.     Numerosity: Due to the nature of the trade and commerce involved, Plaintiff believes there are thousands of Class members as above described, the exact number and their identities being known to Defendants and their Co-conspirators.

21.     Typicality: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, directly from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

22.     The facts of this case are the same for all members of the class in that Defendants' conduct in conspiring and agreeing to restrain competition was the same for all members of the class.

23.     The same legal standards govern resolution of each claim set forth below for all members of the class and across each of the class member's individual claims. If Defendants are liable to one member of the class, Defendants are liable to all members of the class.

24.     Because the claims of each member of the Class have a common origin and share a common basis in terms of Defendant's systematic misconduct, there are common questions of fact and law which exist and which are susceptible to common answers as to each Class member under Federal Rule of Civil Procedure 23(a)(2), and which predominate over any questions affecting only individual members under Federal Rule of Civil Procedure 23(b).

25.     Commonality: There are questions of law and fact common to the Class, including, but not limited to:

  a.  Whether Defendants entered into a conspiracy and agreement to cooperate in the open display advertising market rather than compete;

  b.  Whether Defendants' agreement allocated customers between them;

c.  Whether Defendants' agreement allocated market segments in the ad tech stack between them;

d.  Whether Google entered into an agreement with Facebook for Facebook to win a fixed percentage of Google's auctions;

e.  Whether Facebook was granted preferences not granted to other bidders in Google's auctions;

f.  Whether Defendants' agreement unreasonably restrained trade and thereby violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.  Whether Defendants' violation was a cause of injury-in-fact to Plaintiff and the class members and whether such injury constituted antitrust injury;

h.  The appropriate measure and quantum of aggregate damages suffered by the class caused by Defendants' violation; and,

i.  Whether Defendants should be permanently enjoined from engaging in the same or similar concerted action or agreement in the future.

26.  <u>Predominance:</u> These and other common questions of law or fact predominate over any questions affecting only individual members of the Class.

27.  <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interest are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of the class actions and antitrust litigation to represent itself and the Class.

28.  <u>Superiority and Manageability:</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the

possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation and Class members' interests in individually controlling the prosecution of separate actions is de minimis and impracticable. Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. The Class members' interests in individually controlling the prosecution of separate actions is de minimis and impracticable and it is desirable to concentrate litigation of these claims this forum. There are no known or apparent likely difficulties in managing a class action. A class action will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## V.    FACTUAL ALLEGATIONS

29.    When a user visits a website or uses a mobile application, the ad space on the page is instantly routed into one or more ad exchanges to be sold to the highest bidder in a real-time, electronic auction. At the conclusion of the auction, the winning advertiser's ad displays to the user in time for the page to load and before the user has noticed anything has occurred. The user just sees the website page and the ad targeted to them. This process is known as "programmatic display advertising." Although some advertising space is sold at fixed prices through direct deals between publishers and advertisers or media agencies, most display advertising is sold programmatically. More than 86% of online display advertising traded programmatically in 2020.

30.    The scale of Google's audience and Facebook's social network is large enough for Defendants to offer their own self-serve interfaces for programmatic trading. Advertisers

engage Google and Facebook to place ads on Google and Facebook owned-and-operated sites, such as YouTube (owned by Google) and Instagram (owned by Facebook). The placement of ads on Google and Facebook's own sites are said to be placed within the firm's "walled garden" and is sometimes known as "first party" display advertising. Over half of first party display advertising is generated by Facebook (for space on Facebook Blue and Instagram), with the second highest share belonging to Google (primarily for YouTube). Operators of walled gardens enjoy an intrinsic advantage over other sellers of programmatic display advertising because media companies with authenticated users achieve significantly better economics than media companies with anonymous traffic.

31.     For most other publishers of online content, however, programmatic trading is only possible through a range of intermediaries between advertisers and publishers known as the "ad tech stack." Google and Facebook both leverage the information they know about users, their programmatic trading technologies, and their enormous customer base of advertisers and media agencies to sell impression-targeted display ad space on behalf of other market participants. Known as "open display advertising," advertisers in this market buy inventory from many publishers with a smaller scale (for example, newspapers and app providers). Open display advertising comprises 30-40% of total programmatic display ad expenditures. Because they maintain much richer and higher quality user data and exhibit much greater scale and reach than their rivals, Google and Facebook enjoy a substantial competitive advantage over other intermediaries in the open display market. For example, Google can track users' visits to at least 70% of the top one million sites on the internet and has tags (including as a third party) tracking user behavior on over 80% of popular websites. Facebook has the second highest prevalence of tags, covering between 40-50% of the most popular websites. Amazon, which operates a similar

walled garden, is growing their open display intermediation business, but remains third after Google and Facebook, with less than 10% of the open display ad market. The non-walled garden share of programmatic open display advertising has declined by roughly $1 billion/year for the past several years.

32.     The ad tech stack that connects advertisers with publishers consists of the following types of participants, starting with the advertiser-facing (demand side) participants:

      a.  Media agencies, used by large advertisers to plan and deliver advertising campaigns and provide technical expertise to execute programmatic buying;

      b.  Advertiser ad servers, used by advertisers and media agencies to store ads and deliver them to publishers;

      c.  Demand side platforms ("DSPs"), used by advertisers and media agencies to bid on and buy advertising space (inventory) from multiple sources according to the buyer's objectives and data about the inventory and the final user;

      d.  Supply side platforms ("SSPs"), used by publishers to collect bids from DSPs, automate the sale of inventory through real-time auctions or direct deals with advertisers, and perform the ad exchange function;

      **e.**  Publisher ad servers ("PAS"), used by publishers to manage inventory and to determine which ads to serve based on the bids received from SSPs or agreed between the publisher and advertisers.

33.     On September 15, 2020, the Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the Senate Judiciary Committee held a hearing on the subject of "Stacking

the Tech: Has Google Harmed Competition in Online Advertising?" The Subcommittee's

Majority Staff Report and Recommendations, released on October 6, 2020, reported that Google

captures over 50% of the market across the ad tech stack. It runs the leading ad exchange

(formerly known as AdX), while also running buy-side and sell-side intermediary platforms

trading on this exchange. Google's dominance is a result of a series of acquisitions completed

since 2008, when Google purchased the leading ad server, DoubleClick, which provided the

technology for Google's current PAS. Two years later, Google acquired AdMob, the largest ad

server for the mobile application market. In 2010, Google acquired Invite Media, which it re-

launched in 2012 as DoubleClick Bid Manager and eventually converted into Google's

enterprise DSP, Display & Video 360 ("DV 360"). In 2011, Google purchased AdMeld, one of

the largest display advertising SSPs, which it integrated into AdX, Google's existing exchange.

And in 2014, Google bought Adometry, an analytics and attribution provider it then integrated

into Google Analytics. On October 20, 2020, the Department of Justice brought suit against

Google for monopolization of the search and search advertising markets, followed by the suit

brought by the Texas attorney general and nine other state attorneys general for monopolization

and attempted monopolization of the PAS, ad exchange, and DSP display advertising markets. It

is unusual, to say the least, for a single company to represent both sellers and buyers in the same

market, and to set the rules for, and conduct, the auctions that determine the winners, losers, and

prices in that market.

     34.    After Google's 2008 acquisition of DoubleClick, the leading intermediary on the

publisher side, DoubleClick immediately began preferentially routing trading activity to AdX,

Google's ad exchange. By 2011, AdX was the leading exchange in the market with the highest

trading volume. At the time, bidding for ad space was conducted sequentially, in a system called

the "waterfall." In this system, a publisher ad server offers a particular impression to a particular exchange; if that exchange produced a bid above the reserve price, the ad was placed. If the exchange did not produce an acceptable bid, the ad server would offer the impression to the exchange next in line, proceeding down a "waterfall" until the impression was sold to a buyer. Typically, Google's AdX was first in line, would assess whether the impression was a valuable user or was instead a low-value impression like a bot. If the former, then Google AdX would bid on the opportunity, if the latter, it would pass the opportunity to the next exchange in line. Aware it was in second place, the second exchange would bid low to account for the risk that the opportunity had low or zero value. The order of exchanges in the waterfall was determined by historical average bid levels.

35.     Google's policy of refusing to let publishers on Google's ad server route their ad spaces to more than one exchange at a time drew the ire of the industry. By 2015, publishers had developed a method known as "header bidding" in an attempt to avoid Google's routing restrictions and to push the advertising market to function more like other electronic trading markets. In header bidding, a publisher inserts a piece of JavaScript code into the header section of their webpages. When a user visits a page, the JavaScript routes information about the website's ad space to multiple ad exchanges, bypassing Google's PAS. Publishers could route inventory to a dozen exchanges at once, instead of routing them to Google's exchange first. This version of header bidding is known as "client-side" header bidding because the bid-request information is stored on the user's device rather on a server. With client-side header bidding, websites use a "wrapper" that sets a universal timeout, a common time limit within which all exchanges must submit a bid. In header bidding, all the SSPs (exchanges) get the chance to view the impression at the same time and submit their respective bids before the ad server is called,

which is why header bidding is also referred to as pre-bidding. Header bidding solved the

problem that arises when an ad exchange with an early place in the waterfall sequence produced

a bid above the publisher's minimum acceptable price and won the impression even if an

exchange later in the waterfall sequence had elicited a substantially higher bid, a situation

illustrated in the following figure:



36.     Moreover, by setting longer timeouts, publishers found they could neutralize any

speed advantages that Google might have from the colocation of its DSPs (Google Ads and

DV360) and its exchange, AdX. Publishers also found that header bidding not only offered

increased yields but increased transparency, because publishers know what each advertiser is

willing to bid before the publisher calls its ad server and can gauge the effect of adjustments in

the timeout on yield. By 2016, about 70% of major publishers had adopted header bidding.

37.     Although header bidding offered publishers certain benefits, it also introduced

some problems. Header bidding can be difficult to implement, requiring both advertising

operations and development resources and it requires the addition of extra code on the webpage

which can slow down the publisher's website and detract from the site's user experience.

Nonetheless, header bidding was widely viewed in the industry as a viable means of challenging Google's hold on the exchange market.

38.     Google refused to participate in header bidding, which severely limited the participants in header bidding auctions because of the large advertiser demand it controls. Moreover, even though the introduction of header bidding created an environment where the bids submitted by SSPs participate in a final, first-price auction, Google's refusal resulted in Google getting a "last look" at bid opportunities because the winning bids from the non-Google exchanges participating in header bidding were then sent to Google's PAS. Google's PAS then submitted it to AdX to see if the bid could be improved, essentially using the results of the header bidding auction as a floor price for AdX bidders. This set-up is inefficient, of course, because advertisers bidding on the other exchanges do not have the opportunity to outbid the winner of the AdX auction.

39.     Instead of adopting header bidding, Google responded by introducing two innovations, a development framework called Accelerated Mobile Pages ("AMP"), which it launched in early 2016, and its own version of header bidding, called Open Bidding (formerly known as Exchange Bidding), which was developed in 2016 but became available in April 2018. Both initiatives were ostensibly intended to address the latency and retooling problems with client-side header bidding, but according to the United Kingdom's Competition & Markets Authority ("CMA") (the U.K.'s antitrust enforcement agency), "a major reason for the introduction of Exchange Bidding appears to have been protecting Google's revenues from the impact of header bidding … ."[4] Moreover, the AMP solution restricted the use of JavaScript,

---

[4] Online Platforms and Digital Advertising, Market Study Final Report (July 2020), Appendix M, ¶ 36, *available at*:
https://www.gov.uk/cma-cases/online-platforms-and-digital-advertising-market-study.

precisely the code that websites (in the case of AMP, mobile apps) needed to implement client-side header bidding.[5]

40.     Both innovations move control of the bidding process onto Google's servers. Although both header bidding and Open Bidding are designed to allow simultaneous auctions at several exchanges, Open Bidding requires calls to ad exchanges to be made from Google's ad server rather than from the user's device. For this reason, Open Bidding is known as server-side header bidding. At the same time, Google imposed tighter timeout restrictions, refused to share user data (thereby requiring non-Google exchanges to engage in a time-consuming process of "cookie matching" to identify the user), and levied a 5-10% fee on ads from non-Google ad exchanges.

41.     Similarly, the AMP framework requires publishers to allow Google to host publishers' content on its own servers to enable them to be served faster. Once a publisher loads content in AMP format, Google creates a cached version on Google's servers. Each time a user navigates to the publisher's AMP content from a Google property (*e.g.*, Search or Google News), instead of directing the user to the publisher's server, Google serves the AMP content from Google's AMP cache server, a practice which prevents publishers from collecting their own data on its users.

42.     Google could profitably resist adopting header bidding and promote the AMP framework only because publishers cannot ignore its huge user base. But, Facebook controls even greater demand, accounting for over half of all display advertising revenue and considered

---

[5] Google recently loosened its restrictions on the use of JavaScript in its AMP solution, but it remains incompatible with client-side header bidding in its original form because it limits the number of vendors that publishers can route to five, allows only a single cookie-sync, and imposes strict trading timeouts.

a 'must have' platform by many advertisers. It has a significant user data advantage, which both increases the value of its advertising inventory and creates additional barriers for its competitors to overcome. Through FAN, the Facebook Audience Network, Facebook sells space outside its walled garden, including space on over half of all mobile apps available on the Google Play Store. More than a billion people per month see an advertisement in a website or mobile app through FAN. Moreover, because consumers now use their phones more than their computers and publishers receive approximately 60% of their traffic from mobile use, Facebook's user base and mobile inventory have become even more important.

43.     In March 2017, Facebook announced that the company had chosen a group of technology partners through which it would implement a header bidding solution that opened FAN's demand source directly to web and mobile app publishers, enabling publishers and advertisers to avoid the fees for transacting through Google's ad server. The competitive threat posed by Facebook's adoption of header bidding was not lost on Google. According to the *Wall Street Journal*, Google advertising executive Chris LaSala wrote in an internal document outlining the company's 2017 priorities: "Need to fight off the existential threat posed by header bidding and FAN."[6] The *Times* reported a Google executive calling for "an all hands on deck approach."[7]

44.     The specter of Facebook, Amazon, and thousands of publishers lining up in 2017 to resist Google's dominance over the ad tech stack by promoting technology that would enable

---

[6] Ryan Tracy and Jeff Horwitz, "Inside the Google-Facebook Ad Deal at the Heart of a Price-Fixing Lawsuit," *Wall Street Journal*, Dec. 29, 2020, available at https://www.wsj.com/articles/inside-the-google-facebook-ad-deal-at-the-heart-of-a-price-fixing-lawsuit-11609254758.

[7] Daisuke Wakabayashi and Tiffany Hsu, "Behind a Secret Deal Between Google and Facebook," *New York Times*, Jan. 17, 2021, available at https://nyti.ms/3imRzwt.

multi-exchange, simultaneous, and transparent first-price auctions without first going through Google's ad server would become known as the "header bidding wars."

## VI.    DEFENDANTS' CONSPIRACY TO RESTRAIN COMPETITION

45.    Within months of Facebook's announcement, Google and Facebook began to negotiate a truce to their competitive rivalry in the open display advertising market. The Defendants' negotiations resulted in a conspiracy and agreement reached in September 2018 to allocate customers, allocate market segments, and rig the ad auction process in favor of Facebook's advertisers. Facebook agreed to curtail its header bidding initiative and instead send its bids through Google's ad server, an agreement that was codenamed "Jedi Blue" within Google. Facebook also agreed to bid on 90% of auctions when the end user's identity was known and promised a minimum annual spend of up to $500 million in the fourth year of the agreement. In exchange, Google would grant Facebook significant concessions not granted to other bidders, including:

a.  Facebook would have a guaranteed "win rate" over all the auctions in which it participated;

b.  Facebook was allowed a 300 millisecond timeout in which to place their bids, while other bidders had only 160 milliseconds;

c.  Facebook would have a direct billing relationship with publishers, rather than settle billing through Google;

d.  Facebook would receive superior information about end users, including the identity of 80% of mobile users and 60% of web users; and

e.  Google agreed not to use data about Facebook's bids for its own strategic purposes.

46.     In addition, defendants agreed to confidentiality provisions and to "cooperate and assist" one another in the event of any antitrust investigation of their agreement. According to the *Times*, the word "antitrust" is mentioned no less than 20 times in the agreement.[8]

47.     But for the Defendants' unlawful agreement, it would not have been profitable for Google to require publishers to adopt its Open Bidding solution and charge bids won on non-Google exchanges a 5-10% surcharge.

48.     By granting Facebook's bids preferential treatment, Google rendered Facebook's advertisers uncontestable, effectively allocating advertisers between the two Defendants rather than competing for them. By choosing to accept preferences from Google rather than challenging Google's Open Bidding program, Defendants allocated to one another different market segments within the ad tech stack. By rigging auctions so that Facebook would achieve a guaranteed win rate and providing Facebook with superior information and longer timeouts, Defendants rigged a competitive auction to their own benefit. Each of these acts constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## VII.   ANTITRUST INJURY

49.     As a direct and proximate result of Defendants' unlawful agreement and conspiracy, Plaintiff and the members of the class have suffered antitrust injury. Since at least September 2018 and for each occasion on which Plaintiff and the class members won bids and purchased open display advertising space from Google Ads or another non-Facebook DSP, the winning bid was systematically inflated above the bid that would have won the auction in the absence of Defendants' unlawful agreement.

---

[8] *Id.*

50.     The injury to Plaintiff and the class members arising from Defendants' unlawful agreement consists of economic harm to Plaintiff and the class member's business or property flows directly from the anticompetitive nature of Defendants' violation and is injury of the kind the antitrust laws were intended to prevent.

## VIII.   CLAIM FOR RELIEF

### COUNT I

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (Against All Defendants on behalf of the Class)

51.     Defendants entered into and carried out an unlawful customer and market allocation and bid-rigging agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

52.     In 2017, Facebook announced its support for the auction process known as "header bidding," signaling to Google that Facebook's FAN intended to compete head-to-head with Google Display Network in the open display advertising market. Facebook's endorsement of header bidding would constitute a significant competitive threat to Google's market position.

53.     Following Facebook's announcement, Defendants commenced negotiations into an agreement not to compete. In September 2018, Google and Facebook reached an agreement— which Google codenamed "Jedi Blue,"—the effect of which was to eliminate and nullify competition between FAN and GDN over advertisers and publishers and to rig bids on Google's auctions in Facebook's favor.

54.     Defendants entered into the agreement with the purpose and intent of restraining competition in the open display advertising market. The agreement did, in fact, restrain competition in the market and thereby caused Plaintiff and the members of the class injury-in-fact and antitrust injury.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the class, requests the following

relief:

a.    A determination that that this action is a proper class action under Federal Rule of

Procedure Rule 23, certifying Plaintiff as class representative, and appointing the

undersigned counsel as class counsel;

b.    An award to Plaintiff and each member of the class treble the amount of damages

actually sustained by reason of the antitrust violations alleged herein;

c.    Other equitable relief that corrects the anticompetitive market effects caused by

Defendants' unlawful conduct; and,

d.    An award of reasonable costs and expenses incurred in prosecuting this action,

including attorneys' fees and expert fees;

e.    Such other relief as the Court may deem just and proper.

## X.    DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly

triable to a jury in this case.

Date: February 9, 2021

By: _____/s/ *Jonathan L. Rubin*_____
Jonathan L. Rubin (D.C. Bar No. 353391)
MOGINRUBIN LLP
1615 M Street, NW, Third Floor
Washington, D.C. 20036
Tel: (202) 630-0616
Fax: (877) 247-8586
jrubin@moginrubin.com

Daniel J. Mogin (*pro hac vice forthcoming*)
Jennifer M. Oliver (*pro hac vice forthcoming*)
Timothy Z. LaComb (*pro hac vice forthcoming*)
MOGINRUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 687-6611
Fax: (619) 687-6610
dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

Richard F. Lombardo (*pro hac vice forthcoming*)
Peter F. Rottgers (*pro hac vice forthcoming*)
SHAFFER LOMBARDO SHURIN
2001 Wyandotte Street
Kansas City, MO 64108
Tel: (816) 931-0500
Fax: (816) 931-5775
rlombardo@sls-law.com
prottgers@sls-law.com

*Counsel for Plaintiff*