# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CLIFFY CARE LANDSCAPING LLC
15837 S. Mahaffie Street
Olathe, KS 66062,

KININ, INC.
1104 Camino Del Mar #101
Del Mar, CA 92104,

RAINTREE MEDICAL AND
CHIROPRACTIC CENTER LLC
931 SW Lemans Ln,
Lee's Summit, MO 64082, and

RODROCK CHIROPRACTIC PA
412 Ames St,
Baldwin City, KS 66006,

on behalf of themselves and all others
similarly situated,

     *Plaintiffs*,

v.

FACEBOOK, INC.
1601 Willow Road
Menlo Park, CA 94025,

GOOGLE LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043,

and

ALPHABET INC.
1600 Amphitheatre Parkway
Mountain View, CA 94043

     *Defendants*.

Civil Action No. 1:21-cv-360-KBJ

(Consolidated with Case Nos. 21-cv-622
and 21-cv-658)

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Assign Date:  2/09/2021
Description:  Antitrust – Class Action

Plaintiffs, individually and on behalf of a Class of all those similarly situated, bring this consolidated amended class action complaint for equitable relief and treble damages against Defendants, GOOGLE LLC, ALPHABET INC. (collectively, "Google") and FACEBOOK, INC. ("Facebook") for violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and allege as follows:

## I.   NATURE OF THIS ACTION

1.      This year alone, online advertisers will spend about $132 billion on online display advertising, in which images, banners, or videos are placed on websites and mobile applications in real time and viewed by end users. Nearly all (about 86%) of this online display advertising will be bought and sold electronically at high speeds through centralized trading venues called "exchanges." The overwhelming majority of exchange traded ads are placed through auctions conducted by defendant Google, which serves tens of billions of exchange traded ads to billions of individual users daily. According to Google, the auction bidding process is "a fair way to select the ads that will appear."[1] Supposedly, everyone benefits from an auction because it "ranks ads based on bids, campaign goals, and quality score …."[2]

2.      Google, however, is not a fair and impartial auctioneer. Since at least September 2018, under a confidential written agreement between Facebook and Google, defendants conspired and agreed that Google would provide Facebook with superior, information about bid requests received by Google's exchange in order to help Facebook achieve a minimum win rate for the bid responses[3] it submits on behalf of its advertising customers. In other words, Google and Facebook conspired to rig the auctions.  Together, defendants broker for most advertisers

---

[1] From "Google Ads Help," available at: https://support.google.com/google-ads/answer/2996564?hl=en#:~:text=Why%20do%20we%20use%20an,publishers%2C%20and%20users%20all%20benefit.

[2] *Id.*

[3] A "bid response" is a bid submitted on behalf of an advertiser in response to a "bid request," a real-time notification by a publisher that display space is available for purchase.

that submit bid responses for exchange traded open display space, all the while claiming to be one another's most significant rival and competitor in that market. Facebook's agreement with Google, its possession of superior information about bid requests, and its win rate commitment were not known to other advertisers that submitted bid responses to Google's exchange in competition with advertisers represented by Facebook.

3.     Defendants' conspiracy was motivated by Facebook's desire for an unfair competitive advantage as a participant in Google's exchange auctions.  It was also motivated by Google's anticompetitive animus to ensure Facebook's loyalty as an advertisers' broker of exchange traded ads by unfairly favoring Facebook in Google's auctions. By entering into the September 2018 agreement, which was codenamed "Jedi Blue" by Google insiders, defendants secretly chose to give Facebook advantages over other bidders rather than conduct a fair and impartial auction. And by sharing information with Facebook that was not made available to other open display brokers and intermediaries, Google chose to eliminate competition between it and Facebook in the brokering of open display advertising, rather than compete on the merits for the business of advertisers.

4.     The Jedi Blue agreement restrains trade and injures competition because it (i) rigs the bidding in Google auctions in favor of Facebook, and (ii) inflates the bid responses of other participants that bid and win against Facebook. Moreover, because the agreement calls for Google to cede some or all of its competitive informational advantage to Facebook, it allocates among defendants the advertisers that were already affiliated with each defendant's brokering services, further blocking competition between defendants.

5.      Plaintiffs, like other class members, submitted winning bid responses to Google's auction through brokers other than Facebook and were not aware of the Jedi Blue agreement or the bidding advantages and other favoritism enjoyed by Facebook.

6.      Defendants' conspiracy and agreement to collude rather than compete violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and has caused and will continue to cause injury to competition and to plaintiffs and all other similarly situated advertisers that bid through Google's exchange using any non-Facebook ad network, bid manager, ad agent, or exchange.  Plaintiffs seek appropriate equitable relief and damages through this action.

## III.    JURISDICTION AND VENUE

7.      This Court has original jurisdiction over plaintiffs' federal antitrust claims, which arise under Sections 1 and 15 of the Sherman Act, 15 U.S.C. §§ 1, 15, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 & 1337.

8.      This Court has personal jurisdiction over defendants, which are found and transact business in this district.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period (defined below), defendants resided, transacted business, and had agents in this district.

10.     Defendants' acts were within the flow of, were intended to have, and did have a substantial effect on interstate commerce in the United States.

IV.     **PARTIES**

A.      Plaintiffs

11.     Plaintiff, Cliffy Care Landscaping LLC, is a limited liability company in good standing, registered in the state of Kansas, with a principal place of business at 15837 S. Mahaffie Street, Olathe, Kansas, 66062.  Plaintiff Cliffy Care Landscaping LLC purchased display advertising through Google Ads between September 2018 and the present.

12.     Plaintiff, Kinin, Inc., is a corporation in good standing, organized under the laws of Delaware and registered in California, with a principal place of business at 1104 Camino Del Mar #101, Del Mar, California, 92104. Plaintiff Kinin, Inc. purchased display advertising through Google Ads between September 2018 and the present.

13.     Plaintiff, Raintree Medical and Chiropractic Center LLC, is a limited liability company in good standing, registered in Missouri, with a principal place of business at 931 SW Lemans Lane, Lee's Summit, Missouri, 64082. Plaintiff Raintree Medical and Chiropractic Center LLC purchased display advertising through Google Ads between September 2018 and the present.

14.     Plaintiff, Rodrock Chiropractic PA, is a professional association company in good standing, registered in the state of Kansas, with a principal place of business at 412 Ames Street, Baldwin City, Kansas, 66006. Plaintiff Rodrock Chiropractic PA purchased display advertising through Google Ads between September 2018 and the present.

B.      Defendants

15.     Defendant, Facebook, Inc., is a publicly traded company, organized under the laws of Delaware with its principal place of business at 1601 Willow Road, Menlo Park, California, 94025 and maintains a substantial presence in this judicial district including its

offices at 575 Seventh St. NW, Washington, D.C. Facebook's principal business provides personal social network services to approximately 3 billion people throughout the world through control of its network, known internally as "Facebook Blue."

16.     Defendant, Google LLC, is a limited liability company organized under the laws of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California maintains a substantial presence in this judicial district including its offices at 25 Massachusetts Ave, NW, Washington, D.C., 20004. Google LLC is a wholly owned and controlled subsidiary of XXVI Holdings Inc., which is a subsidiary of defendant, Alphabet Inc.

17.     Defendant, Alphabet Inc., is a publicly traded company organized under the laws of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043 and maintains a substantial presence in this judicial district. Alphabet owns and controls Google.

18.     Defendants, Google LLC and Alphabet Inc., are collectively referred to herein as "Google." Google is a technology company that provides internet-related services and products, including online advertising technologies, the world's most dominant search engine, the world's largest auctioneer of exchange traded ads, and the world's most visited website, YouTube.

19.     Defendants' conduct was authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of defendants' affairs.

20.     Defendants, through their subsidiaries, divisions, affiliates, and agents, operated as a single unified entity with each acting as the alter ego, agent, or joint venturer of or for the other regarding the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

V.     **NON-PARTY CO-CONSPIRATORS**

21.     Various other persons not named as defendants have participated as co-conspirators or joint venturers with defendants and have made contracts, performed acts, and made statements in furtherance of defendants' conspiracy. The defendants are jointly and severally liable for the acts of such persons whether named or not named as defendants in this complaint.

VI.     **CLASS ALLEGATIONS**

22.     Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following class:

> All persons who purchased open display advertising space through
> an ad broker, ad network, exchange, or other entity not owned or
> controlled by Facebook to reach consumers in the United States
> between September 2018 and the present (the "Class Period").

Specifically excluded from this class are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action. Further excluded from this class are any bidding advertisers not injured as a result of defendants' antitrust violation.

23.     <u>Class Identity/Ascertainability</u>: The class is readily identifiable and is one for which records should exist. For example, defendants have agreed to exchange aggregate data to validate billable display ad placements by Facebook, and Google should maintain records of the participants, bids, and outcomes of the auctions it conducts.

24.     <u>Numerosity</u>:  Due to the nature of the trade and commerce involved, plaintiffs believe there are thousands of class members as above described, the exact number and their identities being known to defendants and their co-conspirators.

25.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the class because plaintiffs purchased display advertising directly from one or more of the defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the class, and the relief sought is common to the class.

26.     The facts of this case are the same for all members of the class in that defendants' conduct, conspiring and agreeing to restrain competition, was the same for all members of the class.

27.     The same legal standards govern resolution of each claim set forth below for all members of the class and across each of the class member's individual claims. If defendants are liable to one member of the class, defendants are liable to all members of the class.

28.     Because the claims of each member of the class have a common origin and share a common basis in terms of defendant's systematic misconduct, there are common questions of fact and law which exist and which are susceptible to common answers as to each Class member under Federal Rule of Civil Procedure 23(a)(2), and which predominate over any questions affecting only individual members under Federal Rule of Civil Procedure 23(b).

29.      <u>Commonality:</u> There are questions of law and fact common to the class, including, but not limited to:

a.   Whether, in or around September 2018, defendants entered into a written agreement wherein Facebook would receive valuable information that

8

other bidders did not receive, including superior information about the advertising opportunity and the end user;

b. Whether Google conducted competitive or anticompetitive open display auctions during the Class Period;

c. Whether defendants' agreement allocated advertising customers between them;

d. Whether Facebook agreed to and did submit bid responses to Google's auctions sufficient to win a minimum percentage of auctions;

e. Whether Facebook agreed to submit and did submit bid requests that would ensure a minimum dollar amount spent by its advertisers for ads traded on Google's exchange;

f. Whether Facebook's possession of superior information bearing on the advertising opportunity was known to other bidders in Google's auctions;

g. Whether defendants' agreement unreasonably restrained trade and thereby violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

h. Whether defendants' violation was a cause of injury-in-fact to plaintiffs and the class members and whether such injury constituted antitrust injury;

i. The appropriate measure and quantum of aggregate damages suffered by the class caused by defendants' violation; and

j. Whether defendants should be permanently enjoined from engaging in the same or similar concerted action or agreement in the future.

30.     Predominance: These and other common questions of law or fact predominate over any questions affecting only individual members of the class.

31.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the class. Plaintiffs have retained counsel competent and experienced in the prosecution of the class actions and antitrust litigation to represent itself and the class.

32.    <u>Superiority and Manageability:</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged class members is impractical.  Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation and class members' interests in individually controlling the prosecution of separate actions are de minimis and impracticable and it is desirable to concentrate litigation of these claims this forum. Absent a class action, it would not be feasible for class members to seek redress for the violations of law herein alleged.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. There are no known or apparent likely difficulties in managing a class action. A class action will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## VII.    FACTUAL ALLEGATIONS

33.    Facebook's 2.8 billion monthly users and Google's 1.8 billion Gmail account holders—together with their identity, search and browsing history, spending habits, social connections, and location—endow these firms with unprecedented capacity to reach and target consumers. Defendants sell display space both on their own "owned-and-operated" properties

(for which they are the exclusive source) and on third party publishers' websites and mobile applications in the "open display" advertising market.

34.     When a user visits a website or uses a mobile application, the ad space on the page is instantly routed into one or more ad exchanges to be sold to the highest bidder in a real-time, electronic auction. At the conclusion of the auction, the winning advertiser's ad displays to the user in time for the page to load and before the user has noticed anything has occurred. The user just sees the website page and the ad targeted to them. Although some advertising space is sold at fixed prices through direct deals between publishers and advertisers or media agencies, most display advertising is sold through real time auction. More than 86% of online display advertising in 2020 were exchange traded ads. The vast majority of these auctions are conducted on the exchange on Google's servers, for which Google charges a transaction fee.

35.     Some advertisers engage Google and Facebook to place ads on Google and Facebook owned-and-operated sites, such as YouTube (owned by Google) and Instagram (owned by Facebook). These display ads are said to be placed within the firm's "walled garden" and are sometimes known as "first party" display advertising. Over half of first party display advertising is generated by Facebook (for space on its principal social network, Facebook Blue, and Instagram), with the second highest share belonging to Google (primarily for YouTube). Operators of walled gardens enjoy an intrinsic advantage over other sellers of display advertising because media companies with authenticated users achieve significantly better end user targeting and advertising economics than media companies with anonymous traffic.

36.     Outside of their walled gardens, Google and Facebook leverage the information they know about end users to broker display ad space available from publishers of websites and mobile applications. Advertisers in this market fill display space offered by many publishers with

a smaller scale than defendants (for example, newspaper web sites and mobile app providers). Google and Facebook enjoy a substantial competitive advantage over other brokers of open display advertising. Google can track users' visits to at least 70% of the top one million sites on the internet and has tags (including as a third party) tracking user behavior on over 80% of popular websites. Facebook's identifying tags cover between 40-50% of the most popular websites.

37.    The following types of intermediaries participate in the sale of exchange traded ad space offered by publishers to advertisers, starting with the advertiser-facing participants:

      a.    Media agencies, used by large advertisers to plan and deliver advertising campaigns and provide technical expertise to purchase exchange traded ads;

      b.    Advertiser ad servers, used by advertisers and media agencies to store ads and deliver them to publishers;

      c.    Bidding or monetization managers, used by advertisers and media agencies to bid on and buy display space according to the buyer's objectives and the data available about the space and the end user;

      d.    Supply side platforms ("SSPs") (or "exchanges"), which collect bid requests and automate the sale of space through real-time auctions or direct deals with advertisers, and perform the ad exchange function;

      e.    Publisher ad servers ("PAS"), used by publishers to manage available space and to determine which ads to serve based on the bid responses from SSPs or agreed between the publisher and advertisers.

38.     On September 15, 2020, the Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the Senate Judiciary Committee held a hearing entitled "Stacking the Tech: Has Google Harmed Competition in Online Advertising?" The Subcommittee's Majority Staff Report and Recommendations, released on October 6, 2020, reported that Google captures over 50% of the market across all digital advertising intermediaries. It runs the leading ad exchange (formerly known as AdX) while also running leading advertiser and publisher brokerage services that trade on their exchange. It is unusual, to say the least, for a single company to represent both sellers and buyers in the same market while also running the exchange on which the auctions are conducted to determine the winners and prices to be paid, because an exchange can distort competition between different buyers by giving some bidders more information or faster execution speeds than others.

39.     For its part, over half of all display advertising revenue is collected by Facebook, which is considered a 'must have' ad broker by many advertisers. This is because Facebook's enormous walled garden creates significant end user data advantages. Information about the end user that will interact with a display ad increases the value of the display space opportunity. A bid request associated with information about the identity and characteristics of the end user is more valuable to an advertiser than the same bid request without that information. In an auction, advertisers will submit bid responses containing higher bids to the former compared to the latter.

40.     Facebook sells open display space outside its walled garden to advertisers through its Facebook Audience Network ("FAN") service. Facebook fills space on over half of all mobile apps available on the Google Play Store, and more than a billion people per month see an advertisement on a website or mobile app brokered by FAN.

41.     By 2011, Google's AdX had become the leading exchange for open display advertising with the highest trading volume. As the exchange, Google controls of the flow of information about bid requests submitted by publishers so it is in a position where it can favor one group of bidders over another. At the time, bidding for ad space was conducted sequentially, in a system called the "waterfall." In this system, a publisher's ad server would offer a particular display space to a particular exchange; if that exchange produced a bid above the reserve price, the ad was placed. If the exchange did not produce an acceptable bid, the ad server would offer the space to the exchange next in line, proceeding down a "waterfall" until the space was sold to an advertiser. Typically, Google's AdX was first in line. It would assess whether the bid request was connected to a valuable user or was instead a low-value opportunity generated by a bot. If the former, then Google AdX would bid on the space, if the latter, it would pass the space to the next exchange in line. Aware it was in second place, the second exchange would bid low, to account for the risk that the opportunity had low or zero value. The order of exchanges in the waterfall was determined by historical average bid levels.

42.     The waterfall was the result of Google's policy of refusing to let publishers on Google's ad server route bid requests to more than one exchange at a time. Publishers that did not route their bid requests through Google could not benefit from Google's superior end user information to enhance the value of their bid requests. Beginning around 2015, the desire to loosen Google's stranglehold on exchange traded advertising led some publishers to support the development of a technology known as "header bidding." With header bidding, information about the end user is contained in a piece of JavaScript code pre-loaded by the publisher into the header section of its webpage, enhancing the value of the display space and allowing advertisers to value it more accurately.

43.     Header biding allows publishers to route bid requests to several exchanges at once instead of routing them to Google's exchange first. This solved the problem that arose when an ad exchange with an early place in the waterfall sequence produced a bid above the publisher's minimum acceptable price and won the space, even if an exchange later in the waterfall sequence had elicited a substantially higher bid. That situation is illustrated in the following figure:



44.     Although header bidding offered publishers certain benefits, it also introduced some problems. Header bidding can be difficult to implement because is requires the addition of extra code on the webpage, which can slow down the publisher's website and detract from the site's user experience.

45.     Google refused to participate in header bidding.  As a result, bidders on Google's exchange get a "last look" at bid requests as the winning bid responses from the other exchanges are submitted to Google. Advertisers bidding on the other exchanges would not have the opportunity to outbid the winner of Google's auction.

46.     In March 2017, Facebook announced that the company had decided to support header bidding. In so doing, Facebook threatened to direct FAN's advertiser demand to web and mobile app publishers that did not transact through Google. According to the *Wall Street*

*Journal*, Google was aware of the competitive threat posed by Facebook's support of header bidding. Google executive Chris LaSala reportedly wrote in an internal document outlining the company's 2017 priorities: "Need to fight off the existential threat posed by header bidding and FAN."[4] The *Times* reported a Google executive calling for "an all hands on deck approach."[5]

47.     Google responded by introducing its own version of header bidding in April 2018, which Google called Open Bidding (initially called Exchange Bidding). Google had already developed a framework called Accelerated Mobile Pages ("AMP") in early 2016. Both initiatives were ostensibly intended to address the latency and retooling problems with header bidding. But according to the United Kingdom's Competition & Markets Authority ("CMA") (the U.K.'s antitrust enforcement agency), "a major reason for the introduction of Exchange Bidding appears to have been protecting Google's revenues from the impact of header bidding … ."[6] Moreover, the AMP solution restricted the use of JavaScript, precisely the code that websites (in the case of AMP, mobile apps) needed to implement header bidding.[7]

48.     Both changes ensured that the final auctions would be conducted by Google on an exchange executed on Google's servers. Although both header bidding and Open Bidding were designed to allow simultaneous auctions at several exchanges, Google imposed tighter timeout restrictions than header bidding, refused to share its end user data (thereby requiring non-Google exchanges to engage in a time-consuming process of "cookie matching" to identify the end user),

---

[4] Ryan Tracy and Jeff Horwitz, "Inside the Google-Facebook Ad Deal at the Heart of a Price-Fixing Lawsuit," *Wall Street Journal*, Dec. 29, 2020.
[5] Daisuke Wakabayashi and Tiffany Hsu, "Behind a Secret Deal Between Google and Facebook," *New York Times*, Jan. 17, 2021, available at https://nyti.ms/3imRzwt.
[6] Online Platforms and Digital Advertising, Market Study Final Report (July 2020), Appendix M, ¶ 36, *available at*:
https://www.gov.uk/cma-cases/online-platforms-and-digital-advertising-market-study.
[7] Google recently loosened its restrictions on the use of JavaScript in its AMP solution, but it remains incompatible with header bidding in its original form because it limits the number of vendors that publishers can route to five, allows only a single cookie-sync, and imposes strict trading timeouts.

and levied a 5-10% fee on ads from non-Google demand sources. Similarly, the AMP framework requires publishers to allow Google to host publishers' content on its own servers to enable them to be served faster. Once a publisher loads content in AMP format, Google creates a cached version on Google's servers. Each time a user navigates to the publisher's AMP content from a Google property (*e.g.*, Search or Google News), instead of directing the user to the publisher's server, Google serves the AMP content from Google's server, a practice which prevents publishers from collecting their own data on its end users.

## VIII.   DEFENDANTS' AGREEMENT TO RESTRAIN COMPETITION

49.     Within months of Facebook's announcement, Google and Facebook conspired to rig Google's auctions in favor of Facebook and to allocate demand in the open display advertising market among them, in return for which Facebook withdrew its support for header bidding. The defendants' conspiracy included a written "Network Bidding Agreement" (the so-called Jedi Blue agreement), effective September 2018.

50.     Under the agreement, Facebook agreed to send its bid responses for open display space through Google's exchange, thereby ensuring that Google would continue to control the information about most publishers' bid requests and end users. In exchange, Facebook received enhanced and proprietary data known only to Google which Google did not supply to other bidders in its auctions. Google promised, *inter alia*, to identify the end user connected to at least 80% of the bid requests from mobile apps and at least 60% of the bid requests from websites (on web browsers that allow cookies). In exchange, Facebook agreed to bid on 90% of the bid requests in which the end user was identified, to bid high enough to win a specified percentage of those auctions, and to commit to a minimum annual spend of up to $500 million in the fourth

year of the agreement. It has been reported that Facebook agreed to use its best efforts to achieve a win rate of 10%.

51.     Formally, the subject matter of the agreement is known as the "Network Bidding Program" or "Program." The Program tightly integrated Facebook's display space brokerage business with Google's and granted access to Facebook to Google proprietary data and information in a manner that is unavailable to other open display brokers, networks, exchanges, or bidding agents. Information about the Program was tightly controlled and coordinated between defendants and the agreement contains strict confidentiality provisions.

52.     Defendants' Network Bidding Program is the functional equivalent of a merger between the two most significant players in the digital advertising market. To plaintiffs' knowledge, defendants did not seek to have the Program reviewed by any federal or state antitrust authority. However, the defendants' agreement sets forth mutual commitments to "cooperate and assist" one another in the event of any antitrust investigation related to the Program. According to the *Times*, the word "antitrust" is mentioned no less than 20 times in the agreement.[8]

53.     Because publicity about and disclosure of the Program was tightly controlled, the digital advertising community in general, and bidders in Google's final ad auctions for display space offered by publishers participating in the Program in particular, had no knowledge of the superior information secretly provided by Google to Facebook. Possessed of undisclosed information relevant to the advertising opportunity, Facebook enjoyed a competitive advantage over other bidders for open display space. Facebook's superior information, specific win rate,

---

[8] *Id.*

and spend commitments inflated the winning bids in Google's auctions above what they would have been had Facebook not had access to such information or had made such commitments.

54.     Other intermediaries, including other ad exchanges and ad networks with market shares significantly smaller than Facebook or Google (*e.g.*, Amazon, AppNexus, and Criteo) also represent advertisers for whom they broker space and submit bid responses to Google's exchange. By providing Facebook with information about the advertising opportunity not available to other bidders and without other bidders' knowledge, the other bidders were placed at a disadvantage because they were forced to bid on opportunities about which they possessed less information than Facebook. The express intent and direct consequence of defendants' agreement was to rig Google's final ad auction to their own mutual benefit.

55.     Moreover, by sharing competitively significant information with its principal rival, Google refrained from competing against Facebook for open display advertising customers, effectively allocating Facebook's open display advertising brokerage business to Facebook rather than competing for it.

56.     Similarly, on October 8, 2018, Google announced its intention to terminate the consumer version of Google+, a personal social network it launched in 2011 to compete with Facebook Blue. Google's withdrawal from social networking, Facebook's core business, was achieved by April 2019 and coincided precisely with defendants' conspiracy to rig open display auctions to favor Facebook and to allocate advertiser customers between them.

57.     The foregoing acts and defendants' conspiracy and agreement constitute a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## IX.   ANTITRUST INJURY

58.     As a direct and proximate result of defendants' unlawful agreement and conspiracy, plaintiffs and the members of the class have suffered antitrust injury. Since at least September 2018 and for each occasion on which plaintiffs and the class members that were not customers of Facebook won bids in response to bid requests to purchase open display advertising space from publishers in the Program, the winning bid was systematically inflated above the bid that would have won the auction in the absence of defendants' unlawful agreement and Facebook's superior information.

59.     The injury to plaintiffs and the class members arising from defendants' unlawful agreement consists of economic harm to plaintiffs and the class members' business or property and flows directly from the anticompetitive nature of defendants' violation and is injury of the kind the antitrust laws were intended to prevent.

## X.   CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Against all defendants on behalf of the class)**

60.     Defendants entered into and carried out an unlawful bid-rigging and customer allocation conspiracy and agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

61.     On or around September 2018, Google and Facebook conspired and agreed to eliminate fair competition for open display advertising space sold through Google's exchange auctions by favoring Facebook with information not provided to other bidders and to nullify competition between defendants for advertisers in the open display advertising brokerage market.

62.     Defendants entered into the conspiracy with the purpose and intent of preventing the fair and impartial auction of open display space offered by publishers participating in the Program. Defendants, through their conspiracy and agreement, did, in fact, restrain competition in the auctions conducted by Google for open display advertising space and thereby caused plaintiffs and the members of the class injury-in-fact and antitrust injury.

## XI.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs, individually and on behalf of the class, request the following relief:

a.     A determination that that this action is a proper class action under Federal Rule of Procedure Rule 23, certifying plaintiffs as class representatives, and appointing the undersigned counsel as class counsel;

b.     An award to plaintiffs and each member of the class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein;

c.     Other equitable relief that corrects the anticompetitive market effects caused by defendants' unlawful conduct; and,

d.     An award of reasonable costs and expenses incurred in prosecuting this action, including attorneys' fees and expert fees;

e.     Such other relief as the Court may deem just and proper.

## XII.   DEMAND FOR JURY TRIAL

63.     Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Date: May 19, 2021

/s/ Jonathan Rubin
Jonathan L. Rubin (D.C. Bar No. 353391)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor
Washington, D.C. 20036
(202) 630-0616
jrubin@moginrubin.com

Daniel J. Mogin (D.C. Bar ID CA00091)
Jennifer M. Oliver (D.C. Bar ID CA00097)
Timothy Z. LaComb *(Pro Hac Vice)*
**MOGINRUBIN LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
(619) 687-6611
dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

*Counsel for Plaintiffs Cliffy Care, Kinin,
Rodrock, and Raintree*

Richard F. Lombardo *(Pro Hac Vice)*
Peter F. Rottgers *(Pro Hac Vice)*
**SHAFFER LOMBARDO SHURIN**
2001 Wyandotte Street
Kansas City, MO 64108
(816) 931-0500
rlombardo@sls-law.com
prottgers@sls-law.com

*Counsel for Plaintiffs Cliffy Care, Rodrock,
and Raintree*

Jason S. Hartley *(Pro Hac Vice pending)*
Jason M. Lindner *(Pro Hac Vice pending)*
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Counsel for Plaintiff Kinin*

**Electronic Mail Service List**

The following counsel were served on May 19, 2021 at the indicated email addresses via

the Court's ECM/CF system:

Thomas O. Barnett
Timothy C. Hester
**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5407
tbarnett@cov.com
thester@cov.com

*Counsel for Defendant Facebook, Inc.*

Justina Sessions *(Pro Hac Vice)*
Benjamin Labow
**WILSON SONSINI GOODRICH & ROSATI**
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2197
jsessions@wsgr.com
blabow@wsgr.com

Michael S. Sommer *(Pro Hac Vice)*
Jonathan M. Jacobson *(Pro Hac Vice)*
**WILSON SONSINI GOODRICH & ROSATI**
1301 Avenue of the Americas,
40th Floor
New York, New York 10019
(212) 497-7728
msommer@wsgr.com
jjacobson@wsgr.com

*Counsel for Defendants Alphabet, Inc. and Google, LLC*

With a copy via email to:

Kevin J. Orsini
**CRAVATH, SWAINE & MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1596
Korsini@cravath.com

*Counsel for Defendant Facebook, Inc.*